BABY DOLLS TOPLESS SALOONS, INC., d/b/a Baby Dolls Saloon–East Plaintiff,

MD II Entertainment, Inc., d/b/a the Fare West, and D. Burch, Inc., d/b/a Baby Dolls Topless Saloon, Intervenors,

Mainstage, Inc., d/b/a P.T.'s Gentlemen's Club; Club Hospitality, Inc., d/b/a Club Lipstick; Frank Smith, d/b/a Sheer D'Lite; OGC Restaurants, L.L.C., d/b/a Obsessions; Santa Fe Cabaret, L.L.C., d/b/a Santa Fe Cabaret; and Case and Point, Inc., d/b/a Bare Facts, Intervenors,

Dimitri Papathansiou, d/b/a Doll's House; Tom K. Lazanas, d/b/a Baby G's and d/b/a Faces; and VJAC Investments, Inc., d/b/a Venus, Intervenors

v.

CITY OF DALLAS, Defendant.

No. CIV.A.3:97–CV–1331–R.

United States District Court,
N.D. Texas,
Dallas Division.

May 2, 2000.

Steven Hershey Swander, Law Office of Steven H. Swander, Fort Worth, TX, Charles J. Quaid, Quaid & Quaid, Dallas, TX, for Baby Dolls Topless Saloons Inc. dba Baby Dolls Saloon–East, plaintiffs.

Walter C. Davis, III, Sangeeta Sharma Kuruppillai, Dallas City Attorney's Office, Dallas City Hall, Dallas, TX, for City of Dallas Texas, defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUCHMEYER, Chief Judge.

Plaintiff Baby Dolls Topless Saloons, Inc. d/b/a Baby Dolls Saloon–East and In-

tervenors MD II Entertainment, Inc. d/b/a The Fare West; D. Burch, Inc. d/b/a Baby Dolls Topless Saloon; Mainstage, Inc. d/b/a P.T.'s Gentlemen's Club; Club Hospitality, Inc. D/b/a Club Lipstick; Frank Smith d/b/a Sheer D'Lite; OGC Restaurants, L.L.C. d/b/a Obsessions; Santa Fe Cabaret, L.L.C. d/b/a Santa Fe Cabaret; Case and Point, Inc. d/b/a The Bare Facts; Dimitri Papathansiou d/b/a Doll's House; Tom K. Lazanas d/b/a Baby G's and d/b/a Faces; and VJAC Investments, Inc. d/b/a Venus brought this action against Defendant City of Dallas ("the City") alleging that Dallas City Code Chapter 41A, as amended by City Ordinance No. 23137 ("the Ordinance"), violates their rights protected by the First and Fourteenth Amendments to the Constitution, and seeking declaratory and injunctive relief. The Court partially granted injunctive relief for Intervenors on March 2, 1998. The injunction enjoined Defendant from enforcing Chapter 41A, as amended by the Ordinance, against Intervenors through the amended definition of "specified anatomical areas" in §§ 41A–2(3), (4), (6), and (7). The Court also enjoined Defendant from enforcing the amended amortization requirements of §§ 41A–13(f)–(i) against certain Intervenors. The Court denied all other requests for injunctive relief.

The Court tried this action without a jury on September 8–10, 14, and 15, 1998. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court makes its findings of fact and conclusions of law as follows:

## I. FINDINGS OF FACT

### A. Preliminary Findings

1. Plaintiff and Intervenors operate nightclubs that present live entertainment consisting of female striptease and topless dancing at various locations in the City of Dallas, Texas.

2. The City is a home-rule city within Dallas County, Texas.

3. In 1986, the City enacted Chapter 41A of the Dallas City Code as a comprehensive zoning and licensing regulation for "sexually oriented businesses." The purpose of Chapter 41A was "to regulate sexually oriented businesses to promote the health, safety, morals, and general welfare of the citizens of the city, and to establish reasonable and uniform regulations to prevent the continued concentration of sexually oriented businesses within the city." DALLAS CITY CODE § 41A–1. The City enacted Chapter 41A after studying the efforts of other cities in regulating such businesses. Chapter 41A originally defined "sexually oriented business" as follows:

> SEXUALLY ORIENTED BUSINESS means an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center.

Ch. 41A–2(17) (1986). An "adult cabaret" was defined as

> ADULT CABARET means a nightclub, bar, restaurant, or similar commercial establishment which regularly features:
>
> (a) persons who appear in a state of nudity; or
>
> (b) live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities"; or
>
> (c) films, motion pictures, video cassettes, slides, or other photographic reproductions which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."

*Id.* § 41A–2(3) (emphasis added). "Specified anatomical areas" was defined as

> SPECIFIED ANATOMICAL AREAS means human genitals in a state of sexual arousal.

*Id.* § 41A–2(18). "Nudity or a state of nudity" was defined as

> NUDITY or a STATE OF NUDITY means the appearance of a bare buttock, anus, male genitals, female genitals, or female breast.

*Id.* § 41A–2(13). Also among the regulations was a requirement that a sexually oriented business be at least 1,000 feet from another sexually oriented business, a church, a school, a residential area, or park. *See id.* § 41A–13. The above definitions and the location restrictions were held to be constitutional by this Court and the U.S. Court of Appeals for the Fifth Circuit. *See Dumas v. City of Dallas,* 648 F.Supp. 1061 (N.D.Tex.1986) (Buchmeyer, J.), *aff'd sub nom. FW/PBS, Inc. v. City of Dallas,* 837 F.2d 1298 (5th Cir.1988), *aff'd in part, rev'd in part on other grounds,* 493 U.S. 215, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990).

4. In light of these decisions, a sexually oriented business that sought to continue offering female striptease and topless dancing could either relocate to a site that complied with Chapter 41A and be licensed as a sexually oriented business, or change their dancers' attire to "simulate" nudity, and be licensed as a "dance hall" under Dallas City Code Chapter 14—which did not, and wasn't designed to, regulate sexually oriented businesses—and remain at their existing locations. This was possible because the definition of nudity in Chapter 41A did not include "simulated" nudity. *See supra* Findings of Fact ¶ 3 [hereinafter FOF]. Most of Intervenors' businesses chose to change their dancers' attire by requiring them to simulate nudity by wearing flesh-colored pasties over their areolae and bikini bottoms. This allowed Intervenors' businesses to avoid being regulated as a sexually oriented business under Chapter 41A, to obtain theater or dance hall licenses pursuant to Chapter 14, and to operate at their existing locations.

5. On January 22, 1992, the City enacted Ordinance No. 21184 amending Chapter 14 to create a new classification of dance halls, "Class D Dance Halls." The City enacted Ordinance No. 21184 because Intervenors' businesses had found a way to circumvent the intent of Chapter 41A and to avoid its location restrictions by featuring semi- or simulated nudity. *See* Ints. Ex. 290 at 4. By creating Class D Dance Halls, the City sought to prevent Interve-

nors' businesses from operating as a theater or dance hall and to subject them to location restrictions similar to those imposed by Chapter 41A. *See id.* Ordinance No. 21184 contained the following relevant definitions:

(5) CLASS D DANCE HALL means any place:

(A) where dancing is permitted one day a week or more by a person in a state of semi-nudity or simulated nudity;

. . .

(14) SEMI–NUDITY means a state of dress in which clothing covers no more than the genitals, pubic region, buttocks, and areolae of the female breast, as well as parts of the body covered by supporting straps or devices.

(15) SIMULATED NUDITY means a state of dress in which any device or covering, exposed to view, is worn that simulates any part of the genitals, buttocks, public region, or areolae of the female breast.

DALLAS CITY ORDINANCE NO. 21184. Ordinance No. 21184 provided an eighteen-month amortization period in which businesses not conforming to the location restrictions could comply with the new requirements. Ordinance No. 21184 also required Intervenors' businesses to comply with various advertising regulations. The City issued to most Intervenors' businesses Class D Dance Hall licenses valid for their existing locations until the end of the amortization period on July 22, 1993.

6. This Court, in *MD II Entertainment, Inc. v. City of Dallas,* Civ. A. No. 3:92–CV–1090–H, 1993 WL 227774 (N.D.Tex. Apr. 15, 1993) (Sanders, C.J.) [hereinafter *MD II(1)*], *aff'd,* 28 F.3d 492 (5th Cir.1994), found Ordinance No. 21184's advertising requirements unconstitutional. However, the Court also found that Ordinance No. 21184's location restrictions and the definition of simulated nudity did not violate the First Amendment. The Court also did not address the constitutionality of the ordinance's definition of semi-nudity. *See id.* at *3 n. 9.

7. In response to Judge Sanders' decision in *MD II(1)*, most Intervenors applied for and obtained a "Class A Dance Hall" license under Chapter 14. To obtain Class A Dance Hall licenses, Intervenors businesses again restructured their operations by requiring their dancers to wear non-flesh colored, opaque pasties to cover their areolae, and bikini bottoms substantially covering their buttocks and pubic area. Such licenses were for one year only, but were subject to renewal.

8. On October 13, 1993, the City enacted Ordinance No. 21837 amending Chapters 14 and 41A "because certain businesses[, such as Intervenors',] featuring adult entertainment found a way to circumvent the locational restrictions set forth in Chapters 14 and 41A." Specifically, the City found that

> To avoid locational restrictions, female dancers had replaced their flesh-colored latex pasties with contrasting colored pasties that covered a little more than the areola of the breasts. This modification in the dancers' attire removed the clubs from coming under the definitions of semi-nudity or simulated nudity, and allowed them to operate under a Class A dance hall license, without additional restrictions.

*See* Ints. Ex. 290 at 5. Ordinance No. 21837 included the following relevant definitions:

> NUDITY or a STATE OF NUDITY means:
> (A) the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast; or
> (B) a state of dress that fails to opaquely cover a human buttock, anus, male genitals, female genitals, or *any part* of the female breast *below the top of the areola.* (additions underlined)
> SEMI–NUDITY means a state of dress in which clothing covers no more than the genitals, pubic region, buttocks, and *any part* [areolae] of the female breast *below the top of the areolae,* as well as parts of the body covered by supporting straps or devices.

> SIMULATED NUDITY means a state of dress in which any device or covering, exposed to view, is worn that simulates any part of the genitals, buttocks, pubic region, or *any part* of the female breast *below the top of the areola.* (additions underlined)

DALLAS CITY ORDINANCE No. 21837 § 2(14) (Oct. 13, 1993). These amendments were made to ensure that all businesses featuring adult entertainment complied with the locational restrictions set forth in Chapters 14 and 41A. *See* Ints.' Ex. 290 at 6. "The mere use of contrasting colored pasties and bikini-bottoms by the dancers would no longer exclude the clubs from the licensing and locational restrictions applicable to Class D dance halls and S.O.B.'s." *Id.* In effect, the ordinance required businesses like Intervenors' to change their dancers attire by making them wear bikini tops if the businesses wished to avoid being classified as sexually oriented businesses and remain in their existing locations.

9. In *MD II Entertainment, Inc. v. City of Dallas*, 935 F.Supp. 1394 (N.D.Tex. 1995) (Maloney, J.) [hereinafter *MD II(2)*], *aff'd,* 85 F.3d 624 (5th Cir.1996) (per curiam) (table), this Court held that Ordinance No. 21837's amendments to the terms "nudity," "semi-nudity," and "simulated nudity" violated the First Amendment as content-based restrictions on expression. In reaching this decision, Judge Maloney held that the City had not shown that it had a substantial interest in curbing deleterious secondary effects associated with semi-nude dancing offered by businesses such as Intervenors' to justify the amendments. *See MD II(2)*, 935 F.Supp. at 1397. Judge Maloney also stated that "no evidence indicates that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects." *Id.* at 1398. Because the City had not supported the amendments with any findings indicating that the amendments were necessary or that there was a causal connection between the amend-

ments and secondary effects of semi-nude dancing, Judge Maloney concluded that the amendments were content-based, and impermissibly restricted the plaintiffs' constitutionally protected expression. *See id.* On appeal, the Fifth Circuit affirmed Judge Maloney in an unpublished, per curiam decision stating that "[w]e agree that 'no evidence indicates that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects.'" *MD II v. City of Dallas,* 85 F.3d 624 (5th Cir.1996) (slip op.) (per curiam).

10. On May 28, 1997, the City enacted Ordinance No. 23137 ("the Ordinance") amending Chapters 14 and 41A. Importantly, Ordinance No. 23137 amends Chapters 14 and 41A by eliminating the classification of Class D Dance Halls, redefining terms classifying sexually oriented businesses, restricting the location of sexually oriented businesses near child-care facilities, providing restrictions for nude model studios and adult cabarets relating to physical contact between employees and customers and customer access to closed areas within those establishments, and providing for the amortization of nonconforming sexually oriented businesses. *See* DALLAS CITY ORDINANCE NO. 23137 at 1. The relevant provisions of Ordinance No. 23137 amend Chapter 41A as follows:

SEXUALLY ORIENTED BUSINESS means an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center. Dallas City Code § 41A–2(22).

ADULT BOOKSTORE or ADULT VIDEO STORE means a commercial establishment that as one of its principal business purposes offers for sale or rental for any form of consideration any one or more of the following:

(A) books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes or video reproductions, slides, or other visual representations that depict or de-

scribe "specified sexual activities" or "specified anatomical areas"; or

(B) instruments, devices, or paraphernalia that are designed for use in connection with "specified sexual activities." *Id.* § 41A–2(3).

ADULT CABARET means a commercial establishment that regularly features the offering to customers of live entertainment that

(A) is intended to provide sexual stimulation or sexual gratification to such customers; and

(B) is distinguished by or characterized by an emphasis on matter depicting, simulating, describing, or relating to "specified anatomical areas" or "specified sexual activities." *Id.* § 41A–2(4).

ADULT MOTEL means a hotel, motel, or similar commercial establishment that

(A) offers accommodations to the public for any form of consideration provides patrons with closed-circuit television transmissions, films, motion pictures, video cassettes, slides, or other pornographic reproductions that are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas"; and has a sign visible from the public right-of-way that advertises the availability of this adult type of photographic reproductions; or

(B) offers a sleeping room for rent for a period of time that is less than 10 hours; or

(C) allows a tenant or occupant of a sleeping room to subrent the room for a period of time that is less than 10 hours. *Id.* § 41A–2(6).

ADULT MOTION PICTURE THEATER means a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are regularly shown that are characterized by the depiction or description of "specified

sexual activities" or "specified anatomical areas." *Id.* § 41A–2(6).

ADULT THEATER means a theater, concert hall, auditorium, or similar commercial establishment that regularly features persons who appear in a state of nudity or live performances that are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities." *Id.* § 41A–2(7).

SPECIFIED ANATOMICAL AREAS means:

(A) any of the following, or any combination of the following, when less than completely and opaquely covered:

(i) any human genitals, pubic region, or pubic hair;

(ii) any buttock; or

(iii) any portion of the female breast or breasts that is situated below a point immediately above the top of the areola; or

(B) human male genitals in a discernibly erect state, even if completely and opaquely covered. *Id.* § 41A–2(24).

SPECIFIED SEXUAL ACTIVITIES means and includes any of the following:

(A) the fondling or other erotic touching of human genitals, pubic region, buttocks, anus, or female breasts;

(B) sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation, or sodomy;

(C) masturbation, actual or simulated; or

(D) excretory functions as part of or in connection with any of the activities set forth in Paragraphs (A) through (C) of this subsection. *Id.* § 41A–2(25).

NUDITY or a STATE OF NUDITY means:

(A) the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast; or

(B) a state of dress that fails to completely and opaquely cover a human buttock, anus, male genitals, female genitals, or any part of the female breast or breasts that is situated below a point immediately above the top of the areola. *Id.* § 41A–2(17).

11. The amended definitions of "sexually oriented business," "adult cabaret," and "specified anatomical areas" operate to classify Intervenors' businesses as sexually oriented businesses—i.e., adult cabarets— subject to location restrictions specified in § 41A–13. Intervenors' businesses now must comply with the location restrictions of § 41A–13 and obtain a sexually oriented license per § 41A–4. However, Intervenors' businesses can also avoid being classified as adult cabarets if their dancers perform in bikini tops to cover their areolae, and remain at their existing locations.

12. The amended definitions of "specified anatomical areas" and "nudity or a state of nudity" contain the same language that this Court found unconstitutional in *MD II(1)*.

### B. Findings Relating to Plaintiff's Claims

13. Plaintiff's application for a Class D Dance Hall license to operate Baby Dolls Saloon East, an adult cabaret, at 9505 East R.L. Thornton Freeway ("the Freeway") was denied by the City on May 13, 1997, because the proposed location was within 1,000 feet of a boundary of a residential district, namely R.L. Thornton Freeway. *See* Ints.' Exs. 20, 95. Plaintiff's application for a sexually oriented business license to operate Baby Dolls Saloon East at the same proposed location was also denied by the City on June 23, 1997, for the same reason. *See* Ints.' Exs. 21, 95.

14. As a matter of policy, the City generally zones to the middle of a street or highway. *See* DALLAS CITY CODE § 51A–4.104. However, when a street or highway is the border between Dallas and another city, the City has sometimes extended the zoning line to the city limit line. John Kimbrough, a senior zoning planner for the City's Department of Planning and Development, testified that no City ordinance, regulation, policy, or custom requires such extension of the zoning line to the city limit line. Mr. Kimbrough also testified that the reason why some zoning lines were extended to the city limit line is

because of historical changes in zoning districts, acquisition or sale of property and the resulting changes in zoning therefrom, and mapping errors. The Court credits Mr. Kimbrough's testimony on these findings.

15. Plaintiff's proposed location is precluded because it is within 1,000 feet of a residentially zoned district. To clarify, to the south of the proposed location is the zone line marked by R.L. Thornton Freeway. *See* Ints.' Ex. 95. To the east of the proposed location is the zone line marked by a commercial district zoned as "limited office district," or LO–1. *See id.* However, immediately south of the LO–1 district is an "R–7.5(A)" residential district, which is a classification for large areas of undeveloped land appropriate for single-family use. *See* DALLAS CITY CODE § 51A–4.112(f). Because R.L. Thornton Freeway separates the LO–1 and R–7.5(A) districts, and because the City zones to the center line of a highway if it is the border of a zoning district, the City has zoned property north of the Freeway's center line as LO–1, and property south of the Freeway's center line as R–7.5(A). If the LO–1 zoning district were extended south to the border of the City of Mesquite, the LO–1 district would supplant the R–7.5(A) district, and Plaintiff's proposed location would constitute a conforming use under City Code § 41A–13 because it would not be within 1,000 feet of a residential use. However, because the City has not done so, the classification of the Freeway as an R–7.5(A) residential zoning district precludes Plaintiff's use of the proposed location as a sexually oriented business because the proposed location is 479 to 807 feet from the center line of the Freeway.

16. The Court finds, based on Mr. Kimbrough's testimony, that the City's classification of R.L. Thornton Freeway as an R–7.5(A) residential zoning district is consistent with the City's Development Code and historical zoning practices. Although the City has in other areas classified or extended a zoning line to the city limit line, the Court finds, based on Mr. Kimbrough's testimony, that the City's zoning of the LO–1 district to the center line of R.L. Thornton Freeway is also consistent with the City's Development Code and historical zoning practices.

## C. Findings Relating to Intervenors' Claims

17. The enactment of Ordinance No. 23137 was a response to the City Council's expressed concern to better protect the public health, safety, and welfare, and was intended to address the deleterious secondary effects of sexually oriented businesses, and to enhance land use protection for residential areas and other surrounding areas. *See* DALLAS CITY ORDINANCE NO. 23137 at 2–5; Def.'s Exs. 2–9, 13.

18. Prior to the enactment of Ordinance No. 23137 the Dallas City Council received and considered information concerning the deleterious secondary effects of sexually oriented businesses contained in the 1983, 1986, 1991, and 1997 City of Houston studies, the 1994 and 1997 Malin Group studies, and the summary of land use studies compiled by the National Law Center for Children and Families. *See* DALLAS CITY ORDINANCE NO. 23137 at 2–3; Def.'s Exs. 1–9, 14, 17–20. The studies by Houston and the National Law Center for Children and Families concluded that sexually oriented businesses have adverse secondary effects on surrounding communities involving property values, crime, and quality of life. *See* Def.'s Exs. 4–9. In support of this finding the Court also credits the testimony of Peter Malin, the City's expert, Kathleen Leos, Dallas Independent School District Trustee, and Cherryl Peterman, the City's Director of Planning, who testified to the existence of a connection between Intervenors' businesses and harmful secondary effects on their surrounding communities.

19. Prior to the enactment of Ordinance No. 23137 the City also engaged in the following fact-finding activities:

a. The City Plan Commission conducted open public hearings on March 20 and April 3, 1997, regarding sexually

oriented businesses and the proposed amendments to Chapters 14 and 41A. *See* Def.'s Ex. 11; Peterman Testimony.

b. The City's Zoning Ordinance Advisory Committee ("ZOAC") received public comment at its March 27, 1997, meeting regarding sexually oriented businesses and the proposed amendments to Chapters 14 and 41A. *See* Def.'s Ex. 10. The ZOAC approved the amendments by a 6–0 vote. *See id.*

c. The City Council held at least six town hall meetings regarding sexually oriented businesses and the proposed amendments to Chapters 14 and 41A. *See* Def.'s Ex. 14.

d. The City Council conducted public hearings on May 14, 1997, and May 28, 1997, regarding the proposed amendments to Chapters 14 and 41A. At these hearings citizens came forward to express their opinions for and against the proposed amendments. *See* Def.'s Exs. 12–14; Peterman Testimony; Leos T. timony.

20. In 1997, the City retained the Malin Group to conduct a study that updated its original 1994 study on the secondary effects of sexually oriented businesses. *See* Def.'s Exs. 2–3; Malin Testimony. The 1994 and 1997 studies show that the continued concern of the City regarding harmful secondary effects created by sexually oriented businesses remains justified. *See id.* Both studies reaffirmed the original findings made by the City in 1986 that sexually oriented businesses cause harmful secondary effects on the surrounding community, and that such effects are the same whether the business is featuring dancers in a state of nudity or semi-nudity because the public perception is the same. *See id.* The studies reviewed studies of adult entertainment completed by Austin, Los Angeles, Indianapolis, Phoenix, and New York, and concluded that these studies found that sexually oriented businesses have negative secondary effects, such as increased crime rates, depreciation of property values, deterioration of community character, and deteriorating quality of life. *See id.*

21. The Malin Group also studied secondary effects in Dallas. *See id.;* Malin Testimony. The Malin Group study created a study area consisting of seven sexually oriented businesses and compared the area with two control areas that did not have any such businesses or had such businesses separated at least 1,000 feet apart. *See* Def.'s Ex. 2 at 6. The studies gathered data on property values and crime, specifically rape, prostitution, murder, burglary, assault, theft, and robbery, in the surrounding communities. *See id.* at 6, 14. The study found that sex-related crimes were over three times higher in the study area than the citywide average, and five to ten times higher than in the control areas. *See id.* at 14. This result was similar to a study conducted by the Dallas Police Department before the enactment of Chapter 41A in 1986. *See id.* The study also showed that in the community surrounding ...ally oriented businesses the property values were lower, the length of time prior to property sales were higher, and the properties located near such businesses were harder to lease. *See id.* at 12.

22. However, the Malin studies did not study whether a change in a dancer's attire from pasties to bikini tops would affect secondary effects. *See* Def.'s Exs. 2–3; Malin Testimony. Mr. Malin also testified that his studies indicated that the change in attire would not have an impact on secondary effects.

23. The amended definition of "specified anatomical areas" does not extend the definitions of "adult bookstore," "adult video store," and "adult motion picture theater" to include bookstores, video stores, and motion picture theaters that feature NC–17, R, and PG–13 rated films or video tapes containing nudity that display specified anatomical areas. The City's interpretation of specified anatomical areas, adult bookstore, adult video store, and adult motion picture theater as indicated by the City Attorney's memorandum to the Dallas Police Department would specifically exclude films or video tape rated

NC–17, R, or PG–13 containing nudity from the category of material considered to be "characterized by the depiction or description of" specified anatomical areas or specified sexual activities as defined in the Ordinance. *See* Def.'s Ex. 24. The Court also credits the testimony of Dallas Police Department Assistant Chief John Holt, and Detectives Paul Ronyak, and Steve Foster in making this finding.

24. In 1987, the City enacted the Dallas Development Code, *see generally* DALLAS CITY CODE § 51A, which established a new zoning code for the City revamping the zoning landscape by eliminating cumulative zoning. Chapter 51A rezoned each piece of property in the City, resulting in less areas available for sexually oriented businesses.

25. There are within the City 80–90 available sites for Intervenors and others seeking to engage in sexually oriented businesses. The City contended that there were 244 available sites, whereas Intervenors claimed that there were only 50. *See* Def.'s Ex. 21; Robert Reeves Testimony; Ints. Ex. 45; Michael Coker Testimony. While the actual number of such sites cannot be reduced to a precise figure, upon review of the reports and testimony of Michael Coker, Intervenors' expert, and Robert Reeves, the City's expert, the Court finds that there are at least 80–90 sites within the City for the 18–22 sexually oriented businesses that may be forced to relocate because of the Ordinance. *See also* Def.'s Exs. 15, 16, 21, 22.

26. The City has generally issued sexually oriented business licenses when the applicants meet the criteria set forth in Chapter 41A. *See* Holt Testimony; Ronyak Testimony.

27. During 1991–1997, 41% of applications filed by sexually oriented businesses seeking exemptions from Chapter 41A's location restrictions have been granted by the City's Permit and License Appeal Board ("PLAB"). *See* Def.'s Exs. 25–30. In making this finding, the Court also credits the testimony of Assistant City Secretary Barry Davis, Steve Craft, and Officers Ronyak and Foster.

28. The City has appointed to the PLAB individuals who have openly expressed hostility towards sexually oriented businesses regardless of whether they are licensed or exempted, and whose credibility and impartiality as a member of the PLAB is highly questionable. *See* Craft Testimony. Specifically, Jim Williams and Judy McCoy, as members of the PLAB, have served on PLAB panels that never granted a location or late hours exemption for a sexually oriented business applicant. *See id.;* Ints.' Ex. 55.

29. The City has permitted ex parte contacts between members of the PLAB and the board of adjustment and various community organizations and individuals, including members of the City Council, seeking to shut down sexually oriented businesses. *See* Craft Testimony; Elias Martinez Testimony. Such contacts have resulted in the denial of an exemption or license and the reduction of amortization periods for sexually oriented businesses. *See* Craft Testimony; Martinez Testimony; Ints.' Ex. 252.

30. The City had originally allowed Intervenor Baby Dolls Topless Saloons, Inc. d/b/a Baby Dolls Topless–West an amortization period of 13 years to recoup its investment under Chapter 41A, but later reduced that period to 90 days at the direction of the City Attorney and the City Council. *See* Martinez Testimony; Craft Testimony.

31. Intervenors' businesses feature table or lap dancing, which involves contact between the dancer, while exposing specified anatomical areas, and the customer. *See* Dr. Judith Hanna Testimony; Hillary Milkovich Testimony.

32. The City, through the testimony of Chief Holt, Detectives Ronyak and Foster, and Officer Michael McMurray, established that public lewdness and other crimes sometimes occur in sexually oriented businesses as a result of touching or

groping by dancers and customers. They also testified that such occurrences require continued investigation and monitoring of sexually oriented businesses by the City.

## II. CONCLUSIONS OF LAW

### A. Preliminary Conclusions

1. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, and 42 U.S.C. § 1983.

■■■ 2. The City is not precluded from litigating the constitutionality of the Ordinance. Under the judicial doctrine of collateral estoppel, or issue preclusion, a prior judgment is given preclusive effect to a subsequent litigation if "(1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine." *Texas Office of Pub. Util. Counsel v. Federal Communications Comm'n*, 183 F.3d 393, 435 n. 75 (5th Cir.1999) (citing *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391 (5th Cir.1998), *cert. denied*, 526 U.S. 1034, 119 S.Ct. 1286, 143 L.Ed.2d 378 (1999)). The issue in this case is not "identical" as in *MD II(2)* because this case presents the constitutionality of an different ordinance, which uses the same language as the unconstitutional ordinance in *MD II(2)*, that was enacted by the City after considerable study and fact-finding, which were lacking in *MD II(2)*. Even if the issue here is "identical" and even assuming that the issue was fully litigated and necessary to support the judgment in the prior case, the Court concludes that the enactment of Ordinance No. 23137 after the City's fact-finding is a "special circumstance" that makes the application of issue preclusion unfair. *See Deweese v. Town of Palm Beach*, 688 F.2d 731, 734 (11th Cir.1982) (refusing to give preclusive effect to a prior state court judgment declaring a Palm Beach ordinance banning jogging without a shirt as unconstitutional to a subsequent

amendment of the ordinance). Were the Court to accept Intervenors' argument, the City would be forever barred from enacting an ordinance that contained the amended definitions, a result that would be unfair if the facts justifying such amendments were to occur.

### B. Conclusions Relating to Plaintiff's Claims

■■■ 3. Plaintiff has standing to make an as-applied challenge to the application of the City's zoning of R.L. Thornton Freeway as a residential district to deny Plaintiff's applications for Class D Dance Hall and sexually oriented business licenses. *See Dumas*, 648 F.Supp. at 1068 (" 'It is clear that a party may challenge a licensing statute regardless of whether he or she was denied a permit, or whether one has ever been sought.' ") (quoting *Fernandes v. Limmer*, 663 F.2d 619, 625 (5th Cir.1981)). Plaintiff's claim is also ripe for adjudication. *See id.*

■■■ 4. The City's classification of R.L. Thornton Freeway as a residential zoning district, and the City's denial of Class D Dance Hall and sexually oriented business licenses for Plaintiff's proposed location is constitutional. Ordinarily, a zoning regulation is constitutional if "there was any possible rational basis for legislation." *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1273 (5th Cir.1988) (internal quotation marks omitted) (citing *Shelton v. City of College Station*, 780 F.2d 475, 479 (5th Cir.) (en banc), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986)). Because the City's zoning of R.L. Thornton Freeway as an R–7.5(A) residential zoning district is consistent with its Development Code and historical zoning practices, the classification of R.L. Thornton Freeway as a residential zoning district has a rational basis, and does not violate Plaintiff's due process rights protected by the Fourteenth Amendment.

■■■ 5. Moreover, the classification of the Freeway as a residential district does

not violate Plaintiff's First Amendment rights. The classification predates the existence of sexually oriented businesses and was not motivated to restrict any form of expression, especially Plaintiff's. Thus, the classification is a content-neutral, generally applicable law that does not violate the First Amendment even if it incidentally burdens Plaintiff's protected expression. *See Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882, 110 S.Ct. 1595, 1602, 108 L.Ed.2d 876 (1990). In consequence, there is no need to utilize a higher level of scrutiny and analyze whether the classification is justified as a time, place, and manner regulation. Plaintiff's claim that the classification violates its protected expression fails as a matter of law.

### C. Conclusions Relating to Intervenors' Claims

6. Plaintiff and Intervenors allege that the Ordinance's definitions of specified anatomical areas and nudity or a state of nudity are overbroad because they have the effect of classifying any motion picture theater, theater, video store, book store, motel, newsstand, modeling and photography studio, lingerie store, or any other "mainstream business" that displays or depicts specified anatomical areas as a sexually oriented business. Additionally, Plaintiff and Intervenors claim that the amended definition of nudity or a state of nudity is overbroad because their businesses may now be classified as adult theaters or nude modeling studios.

■ 7. A litigant may mount a constitutional attack against a statute by alleging that it is overbroad under the First Amendment, that is, a statute may be unconstitutionally overbroad if the existence of the statute "may cause others not before the court to refrain from constitutionally protected expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973). However, "facial overbreadth adjudication is an exception to ... traditional rules of practice and ... where conduct and not merely speech is involved, ... the overbreadth of

a statute must not only be real, but substantial as well." *J & B Entertainment, Inc. v. City of Jackson*, 152 F.3d 362, 366 (5th Cir.1998) (quoting *Broadrick*, 413 U.S. at 615, 93 S.Ct. at 2917) (internal quotation marks omitted) (second and third alterations in original). Moreover, a statute is not facially overbroad "when a limiting construction has been or could be placed on the challenged statute." *Broadrick*, 413 U.S. at 613, 93 S.Ct. at 2916.

■ 8. Under the above authority, the Ordinance is not overbroad. Plaintiff's hypothetical examples in which the amended definitions may be overbroad can be imagined are neither real nor substantial. *See J & B*, 152 F.3d at 366. In *Dumas*, this Court rejected the allegation that the definitions of specific sexually oriented businesses and specified anatomical areas under Chapter 41A were unconstitutionally vague or overbroad. *See Dumas*, 648 F.Supp. at 1075–76. While *Dumas* involved the alleged overbreadth of the definition of specified anatomical areas, which was defined as "human genitals in a state of sexual arousal," *see supra* FOF ¶ 3, the Court concludes that the City's amendment of specified anatomical areas to include "any portion of the female breast or breasts that is situated below a point immediately above the top of the areola," does not render Chapter 41A unconstitutionally overbroad. As in *Dumas*, the amended definition of specified anatomical areas has been upheld by many courts, especially the Fifth Circuit in *SDJ. See SDJ*, 837 F.2d at 1276. Also, since *Dumas*, the City has never classified any mainstream business as a sexually oriented business even if such business featured an article or activity that displayed a specified anatomical area as defined by Chapter 41A. *See* Def.'s Ex. 24; Holt Testimony. Moreover, the Court has found that the City Attorney has offered a limiting construction that precludes the classification of mainstream businesses as sexually oriented businesses even if such businesses feature an article or activity that display a

specified anatomical area.[1] *See supra* FOF ¶ 23; *see also City of Dallas v. MD II Entertainment, Inc.*, 974 S.W.2d 411 (Tex.Civ.App.—Dallas 1998, no writ). Chief Holt testified that the police department relies on the City Attorney's construction of Chapter 41A, and does not and will not classify mainstream businesses as sexually oriented businesses under the amended definitions absent other circumstances. Such limiting construction effectively negates Intervenors' overbreadth challenge to the amended definitions. *See Broadrick*, 413 U.S. at 617, 93 S.Ct. at 2918 (rejecting overbreadth challenge to Oklahoma statute regulating political activity by using interpretations of the statute by a state agency and the attorney general as limiting constructions); *J & B*, 152 F.3d at 367; *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1254–55 (5th Cir.1995). Furthermore, even assuming that hypothetical examples in which the amended definitions may be overbroad can be imagined, such overbreadth is not substantial in light of Chapter 41A's legitimate sweep. *See Broadrick*; 413 U.S. at 615–16, 93 S.Ct. at 2918; *J & B*, 152 F.3d at 366. Because application of the overbreadth doctrine is "strong medicine" and should only be used "as a last resort," whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which Chapter 41A may not be applied. *See Broadrick*; 413 U.S. at 615–16, 93 S.Ct. at 2918; *J & B*, 152 F.3d at 366. Finally, Intervenors' claim that the amended definitions are overbroad because their businesses may be classified as adult theaters or nude modeling studios rather than adult cabarets fails because Intervenors have not specified how such classification would affect their protected expression when compared to their classification as adult cabarets. In any event, even if such hypothetical classification can occur, any resulting overbreadth can be addressed on a case-by-case basis.

9. Intervenors' next claim alleges that the Ordinance is an unconstitutional content-based restriction on protected expression. Specifically, Intervenors claim that the amended definition of specified anatomical areas was enacted to suppress Intervenors' protected expression, was enacted without any finding linking semi-nude dancing and secondary effects, and is, assuming that there is such a link, not narrowly tailored to combat secondary effects. Relatedly, Intervenors also claim that the amended definition of specified anatomical areas operates to unconstitutionally deny access to protected expression. In support of their claim, Intervenors argue that the history of Chapter 41A and the City's subsequent amendments have prevented sexually oriented businesses from operating at available locations, the locations the City represents as being available are in fact unavailable, the amended definition of specified anatomical areas further restricts any available locations, and the City's licensing/exemption procedure is a sham.

 10. Because erotic adult entertainment is marginally protected by the First Amendment, zoning ordinances designed to address the adverse secondary effects associated with such entertainment are subject to an intermediate level of constitutional scrutiny. *See City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46, 106 S.Ct. 925, 928, 89 L.Ed.2d 29 (1986); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 70, 96 S.Ct. 2440, 2452, 49 L.Ed.2d 310 (1976) ("it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser magnitude than the interest in untrammeled political debate."). The Supreme Court has declared that such a zoning ordinance is analyzed as a "content-neutral" time, place, and manner regulation so long as it is justified without reference to the content of the regulated expression, is designed to serve a substantial

---

**1.** Had the Court accepted Intervenors' argument, CRAIG HOSADA, THE BARE FACTS VIDEO GUIDE (8th ed.1998), a comprehensive collection of nudity in "mainstream" videos, would have been quite useful in identifying which mainstream businesses may be classified as sexually oriented businesses.

governmental interest, and allows for reasonable alternative avenues of communication. *See Renton,* 475 U.S. at 49–50, 106 S.Ct. at 929–30. Under *Renton,* the government bears the burden of justifying that the regulation. *See J & B Entertainment,* 152 F.3d at 370 (citing *Renton,* 475 U.S. at 48, 106 S.Ct. 925); *SDJ,* 837 F.2d at 1273. However, the litigant challenging the regulation bears the burden of proving that the regulation does not allow for reasonable alternative avenues of communication because it denies him a reasonable opportunity to open and operate his business. *See Woodall v. City of El Paso,* 49 F.3d 1120 (5th Cir.1995).

 11. Under *Renton,* the City has adequately justified that Ordinance No. 23137 is a content-neutral time, place, and manner regulation because it was enacted without reference to the content of Intervenors' expression. In enacting Ordinance 23137, the City's predominant concern was with addressing secondary effects associated with sexually oriented businesses. The preamble to the Ordinance states that

> WHEREAS, a number of businesses in the city that provide sexual stimulation and gratification to their patrons have circumvented and frustrated the intent of Chapter 41A by operating as Class A dance halls under Chapter 14 of the Dallas City Code; and
>
> WHEREAS, the provisions of Chapter 14 governing Class A dance halls are intended to regulate businesses where clothed patrons dance and not businesses where unclothed or scantily clad dancers perform to provide sexual stimulation and gratification to patrons; and
>
> WHEREAS, the city council finds that such businesses operating as Class A dance halls under Chapter 14 are, in effect, sexually oriented businesses and have the same harmful secondary effects on the surrounding community as the sexually oriented businesses currently regulated under Chapter 41A; and
>
> . . .
>
> WHEREAS, the city council finds that a concentration of sexually oriented businesses continue to contribute to a decline in the value of surrounding properties, to an increase in criminal activities in the surrounding community, and to urban blight and a downgrade in the quality of life in the surrounding community; and
>
> . . .
>
> WHEREAS, the city council believes that, to better protect the public health, safety, and welfare, it is necessary to adopt additional amendments to Chapter 41A that would enhance land use protection to residential areas and other surrounding areas; provide requirements for signs and exterior portions of sexually oriented businesses to reduce their harmful secondary effects upon the surrounding community; restrict the location of sexually oriented businesses near child-care facilities to protect the children that attend those facilities; and establish rules of conduct for certain sexually oriented business employees and customers.

Ordinance No. 23137 at 2–5. Moreover, the City reviewed numerous studies, held hearings, and made findings addressing secondary effects. *See* FOF ¶ 19. In short, the City's predominant concern in enacting the Ordinance was to address secondary effects and not to suppress Intervenors' protected expression. Thus, the Ordinance is a content-neutral time, place, and manner regulation justified without reference to the content of Intervenors' protected expression. *See Renton,* 475 U.S. at 48, 106 S.Ct. 925; *SDJ,* 837 F.2d at 1273; *cf. City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 1391, 146 L.Ed.2d 265 (2000) (slip op.).

 12. Because the Ordinance is a content-neutral time, place, and manner regulation of protected expression, the City must also prove that the Ordinance is narrowly tailored to further a substantial interest. *See Renton,* 475 U.S. at 49–50, 106 S.Ct. at 929–30. In *SDJ,* the Fifth Circuit held that

a city may establish its substantial interest in the regulation by compiling a record with evidence that it may be reasonably believed to be relevant to the problem that the city addresses. We do not ask whether the regulator subjectively believed or was motivated by other concerns, but whether an objective lawmaker could have so concluded, supported by an actual basis for the conclusion. Legitimate purpose may be shown by reasonable inferences from specific testimony of individuals, local studies, or the experiences of other cities.

*SDJ*, 837 F.2d at 1274 (internal citations omitted); *see also J & B*, 152 F.3d at 371 ("[T]he government must produce evidence that the challenged ordinance may advance its interest in combating adverse secondary effects attendant to nude dancing."). However, "[t]he First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evidence independent of that already generated by other cities, so long as whatever evidence the city relies upon is *reasonably believed to be relevant to the problem that the city addresses.*" *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931 (emphasis added); *Pap's A.M.*, 120 S.Ct. at 1394. "A local government's interest in preserving the quality and character of neighborhoods and urban centers can . . . support restrictions on both public nudity and adult entertainment." *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931. "In setting forth this interest, a local government may place great weight upon the experiences of, and studies conducted by, other local governments, as well as opinions of courts from other jurisdictions." *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931; *Pap's A.M.*, 120 S.Ct. at 1394. "[The] appropriate focus is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional." *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 582, 111 S.Ct. 2456, 2469, 115 L.Ed.2d 504 (1991) (Souter,

J., concurring); *see also J & B*, 152 F.3d at 371–72; *Pap's A.M.*, 120 S.Ct. at 1404 (Souter, J., concurring). While the evidence produced by the government must demonstrate "a link between the regulation and the asserted governmental interest[ ] under a reasonable belief standard," *id.* (citing *Renton*, 475 U.S. at 51–52, 106 S.Ct. at 931 (internal quotation marks omitted); *see also SDJ. v. City of Houston*, 837 F.2d at 1274), "legislation seeking to combat the secondary effects of adult entertainment *need not await localized proof of those effects.*" *Barnes*, 501 U.S. at 582, 111 S.Ct. at 2469 (Souter, J., concurring) (emphasis added). Finally, an ordinance is narrowly tailored if it effectively promotes the government's interest, but narrow tailoring is less important when the potential for overbreadth burdens sexually oriented expression, which is subject to less than full First Amendment protection. *SDJ*, 837 F.2d at 1276.

13. Under this standard, the City has easily justified that the Ordinance is narrowly tailored to further a substantial interest. The City's substantial interest in addressing actual or potential secondary effects associated with sexually oriented businesses is well-established. The preamble to the Ordinance expressly states that, prior to enactment, the City Council reviewed studies documenting the continued harmful effects of sexually oriented businesses on the surrounding community. *See* Ordinance No. 23137 at 2–3. Specifically, the Ordinance claims that the City Council reviewed studies by its expert, Peter Malin, in 1994 and 1997; studies conducted by Houston before the adoption of its sexually oriented business ordinance in 1983 and before its enactment of its ordinance in 1986, 1991, and 1997; and the summary of land use studies compiled by the National Law Center for Children and Families in 1991 and 1994. *See id.* Moreover, the City Council engaged in numerous fact-finding sessions consisting of the City Plan Commission's public hearings, the ZOAC's solicitation and review of public comment

on the Ordinance, and the City Council's town hall meetings and public hearings, after which the City Council concluded that sexually oriented businesses were causing harmful secondary effects and that the Ordinance was necessary to combat such effects. *See supra* FOF ¶ 19. While Intervenors presented testimony and evidence attempting to negate the empirical validity of the City's fact-finding, *see, e.g.,* McLaughlin Testimony, under the prevailing legal authority, the Court's concern "is not an empirical inquiry into the actual intent of the enacting legislature, but rather the existence or not of a current governmental interest in the service of which the challenged application of the statute may be constitutional." *Barnes,* 501 U.S. at 582, 111 S.Ct. at 2469 (Souter, J., concurring). Thus, Intervenors' protests fail to negate the City's production of more than adequate evidence to support the City's reasonable belief that the Ordinance was necessary to combat harmful secondary effects.

14. While Plaintiff and Intervenors make much of the fact that the City reviewed no study or made no finding that amending the definition of specified anatomical areas to, in effect, require dancers to wear bikini tops would reduce secondary effects, such study or finding is unnecessary under *Renton.* Intervenors correctly note that this Court held the 1993 amendments similar to the Ordinance unconstitutional as content-based restrictions on expressive activity. *See MD II(2),* 935 F.Supp. at 1397. The Court reached that conclusion because the City did not produce any evidence of the link between its substantial interest and the ordinance in combating secondary effects. In reaching this conclusion, the Court stated that "no evidence indicates that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects." *Id.* at 1397. However, in this case the City has apparently learned from the Court's nullification of the 1993 amendments and has compiled more than adequate evidence justifying the Ordinance. *See* FOF ¶ 19.

Although the evidence does not connect the wearing of bikini tops to the reduction of secondary effects, such specific finding is not necessary as long as the City has produced evidence demonstrating a reasonable belief that there is a link between the Ordinance and the substantial interest in combating secondary effects associated with adult entertainment. *See Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931; *SDJ,* 837 F.2d at 1274. The Ordinance simply is not an incrementally stricter regulation of semi-nude dancing that requires a commensurately greater amount of evidence that the regulation is linked to semi-nude dancing, but rather the City's concerted effort to prevent sexually oriented businesses' exploitation of a "loophole" in the City Code that permitted such businesses to avoid the location restrictions by obtaining dance hall licenses pursuant to Chapter 14, which was not originally designed to regulate such businesses. As the City avers in the preamble to the Ordinance, since the original enactment of Chapter 41 in 1986, sexually oriented businesses have frustrated the City's interest in combating secondary effects by exploiting the loophole, and the Ordinance is a comprehensive amendment to Chapters 14 and 41A to carry out the City's original intent in combating secondary effects associated with sexually oriented businesses. In this light, *MD II(2)* is entirely consistent with *Renton* and the Court's conclusion in this case because the First Amendment requires only that the City prove that *it may be reasonably believed* that the regulation of adult entertainment, whether it is dancing performed in nudity, simulated nudity, or semi-nudity, is relevant to addressing secondary effects. *See Renton,* 475 U.S. at 51–52, 106 S.Ct. at 931. Moreover, the Ordinance is consistent with the conclusions of other courts, including the Fifth Circuit, holding that the definition of "specified anatomical areas" to include "the portion of the breast immediately below the top of the areola" does not impermissibly restrict protected expression. *See SDJ,* 837 F.2d at 1276.

**548**

15. The Ordinance is also narrowly tailored. As stated above, the Ordinance is not overbroad. In addition, the Ordinance is designed to close a loophole exploited by sexually oriented businesses to avoid the location requirements and to effectively address any actual or potential secondary effects as a result of such exploitation. In this light, the Ordinance is narrowly tailored because it effectively promotes the City's substantial interest by classifying as sexually oriented businesses only those businesses that are associated with actual or potential secondary effects, and by classifying those businesses that have heretofore avoided the location restrictions of Chapter 41A. The fact that these objectives may be achieved by forcing Intervenors to either change their dancers' attire to avoid being classified as a sexually oriented business or relocate to a site that conforms with Chapter 41A's location requirements does not make the Ordinance insufficiently tailored because sexually oriented expression is entitled to less than full First Amendment protection. *SDJ,* 837 F.2d at 1276.

16. Under the final part of *Renton*'s analysis, an ordinance is constitutional if it does not unreasonably limit alternative avenues of communication. *See Renton,* 475 U.S. at 45, 106 S.Ct. 925. However, the fact that sexually oriented businesses "must fend for themselves in the real estate market, on an equal footing with other prospective purchasers and lessees, does not give rise to a First Amendment violation," and the First Amendment does not compel "the Government to ensure that [sexually oriented businesses], or any other kind[ ] of speech-related business[ ] for that matter, will be able to obtain sites at bargain prices." *Id.* at 54, 106 S.Ct. at 932. The First Amendment only requires that the government "refrain from effectively denying [adult entertainment businesses] a reasonable opportunity to open and operate an adult theater within the city." *Id.* To this end, courts have held that 5–10% of land available for sexually oriented businesses constitutes a reasonable opportunity to pursue alternative

avenues for communication. *See, e.g., id.* (holding the availability of 5% of land in Renton for adult theaters constitutional); *Woodall,* 49 F.3d at 1126–27 (holding that at least 50–66 sites available for 22–39 businesses was adequate); *Lakeland Lounge of Jackson, Inc. v. City of Jackson,* 973 F.2d 1255, 1259–60 (5th Cir.1992) (holding that because there is no constitutional requirement that a specific proportion of a municipality be open for sexually oriented businesses or that a certain number of sites be available, the availability of 4 areas with 8–10 locations for 6 business was more than adequate); *SDJ,* 837 F.2d at 1276 (holding that the availability of at least 40 sites within 20% of Houston for 23 businesses was adequate).

17. The Ordinance does not unreasonably limited alternative avenues of communication for Intervenors' businesses. Considering the evidence and testimony presented by Intervenors and the City, and considering all the factors that may preclude the availability of sites for sexually oriented businesses, there are approximately 80–90 sites available for the 18–22 sexually oriented businesses that may be required to relocate under the Ordinance. *See* FOF ¶ 25. Under the authority cited above, such number affords adequate avenues of communication for sexually oriented businesses. *See Woodall,* 49 F.3d at 1126–27; *Lakeland Lounge,* 973 F.2d at 1260. While Intervenors did prove that the 244 sites the City claimed was available was inaccurate because many of those sites were not commercially feasible, erroneously listed as available, restricted by deed, or precluded because of a protected use, even if those reasons affect the analysis of the adequacy of sites, Intervenors did not prove that the number of available sites was less than 80–90. *See* Coker Testimony.

18. Intervenors' claim that the City's application of its licensing scheme effectively denies a reasonable opportunity to pursue adequate alternative avenues of communication is credible, but not persua-

sive. While the City has sometimes manipulated the licensing and exemption procedure so that sexually oriented businesses are denied licenses or exemptions, 41% of exemption applications were granted from 1991–1997, and licenses were generally issued if an applicant met the statutory criteria. *See* FOF ¶ 26; Holt Testimony; Craft Testimony. The Court does conclude that the decision making processes of the PLAB and the board of adjustment are troubling. For example, the City has appointed individuals with questionable impartiality to the PLAB, tolerated certain councilors' ex parte requests to deny location exemptions for particular applicants, and, at least on one occasion, has inexplicably reduced the amortization period of one Intervenor from thirteen years to 90 days. *See* Martinez Testimony.

19. However, while these actions may seem to "stack the deck" against sexually oriented businesses trying to obtain licenses and exemptions, they do not necessarily result in a denial of a reasonable opportunity to pursue alternative avenues of communication because the City has granted exemptions and licenses if applicants met the statutory criteria. Moreover, the denial of a license, exemption, or an appropriate amortization period is subject to judicial review. *See* DALLAS CITY CODE § 41A–11; TEX. LOCAL GOV'T CODE ANN. § 211.011 (West 1999); *cf. City of Dallas v. MD II Entertainment, Inc.*, 974 S.W.2d 411 (Tex. Civ.App.—Dallas 1998, no writ). Nonetheless, whether such actions by the City may give rise to a claim upon which relief can be granted under another provision of the Constitution is not before the Court because Intervenors have not so pleaded, and the Court expresses no opinion on whether any Intervenor has a cause of action under any state or federal law because of such actions or on whether any Intervenor may later prove with sufficient evidence that such actions of the City give rise to a First Amendment challenge based on such actions constituting an effective denial of a reasonable opportunity to open or operate their businesses under *Renton*'s analysis. Simply put, Intervenors have not adduced sufficient evidence before *this* Court that the City's actions deny such opportunity.

20. The "no-touch" provision of § 41A–18.1 prohibiting all touch between an employee of a sexually oriented business and a customer when the employee is revealing specified anatomical areas is constitutional. Intervenors claim that § 41A–18.1 is unconstitutionally overbroad and is a content-based regulation unjustified by a compelling interest. However, in *Hang On* the Fifth Circuit upheld a similar no-touch provision and held that "intentional contact between a nude dancer and a customer is conduct beyond the expressive scope of the dancing itself." *See Hang On*, 65 F.3d at 1254. The Fifth Circuit held that the no-touch provision was not overbroad, vague, or in violation of the Fourteenth Amendment's Equal Protection Clause. *See id.*

21. The Court concludes that § 41A–18.1 is constitutional because it is authorized by the Fifth Circuit's conclusion in *Hang On. See Hang On*, 65 F.3d at 1253 ("That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment."). While the sexually oriented business-plaintiff in *Hang On* offered no testimony of the expressive nature of touch while a dancer is table or lap dancing, none of the testimony offered by Plaintiff and Intervenors in this case through Dr. Hanna and Ms. Milkovich persuades this Court to conclude differently than the Fifth Circuit in *Hang On*. Thus, § 41A–18.1 is constitutional.

## III. CONCLUSION

For the reasons stated above, the Court concludes that City Ordinance No. 23137 is constitutional. A final judgment incorporating these findings and conclusions shall be entered forthwith.