Revised July 12, 2002

**UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

**No. 00-10651**

_____

**BABY DOLLS TOPLESS SALOONS, INC., doing business as Baby Dolls
Saloon-East,**

**Plaintiff-Appellant,**

**CASE AND POINT, INC., doing business as Bare Facts; MD II
ENTERTAINMENT, INC., doing business as Fare West; D. BURCH, INC.,
doing business as Baby Dolls; MAINSTAGE, INC., doing business as
PT's Gentlemen's Club; CLUB HOSPITALITY, INC., doing business as
Club Lipstick; OGC RESTAURANTS, doing business as Obsessions;
SANTA FE CABARET, LLC, doing business as Santa Fe Cabaret;
DIMITRI PAPATHANSIOU, doing business as Doll's House; TOM K.
LAZANAS, doing business as Baby G's, doing business as Faces;
ALLEN-BURCH, INC., doing business as the Fare,**

**Intervenor Plaintiffs-Appellants,**

**v.**

**CITY OF DALLAS, TEXAS,**

**Defendant-Intervenor Defendant-Appellee.**

**Appeal from the United States District Court
for the Northern District of Texas**

June 20, 2002

Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Primarily at issue is whether the City of Dallas violated

certain establishments' First Amendment rights when it amended its

City Code to effectively require female performers to wear bikini

tops, among other things, in order for those establishments to avoid being classified as sexually oriented business (SOBs), subject, *inter alia*, to zoning restrictions. Plaintiff and Intervenors (Plaintiffs), operators of those establishments, contend: the City is collaterally estopped from litigating the constitutionality of the amendment in the light of a similar City amendment's having been held unconstitutional; the relied-upon studies show no correlation between the bikini top requirement and the amelioration of deleterious secondary effects; the amendment is overbroad; for a related amendment, dancer-patron contact is protected expressive conduct; and the City's practice of zoning residential districts to the middle of roadways is unconstitutional. **AFFIRMED.**

I.

In 1986, after studying other cities' efforts in regulating SOBs, the City enacted Chapter 41A of the Dallas City Code "to promote the health, safety, morals, and general welfare of the citizens of the city, and to establish reasonable and uniform regulations to prevent the continued concentration of [SOBs] within the city". DALLAS, TEX., CODE § 41A-1 (1986). Among other things, Chapter 41A subjected SOBs to certain zoning restrictions, including the requirement that they be located at least 1,000 feet from other SOBs, churches, schools, residential areas, and parks (location provision). It defined a SOB as "an adult arcade, adult

2

bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center". *Id.* § 41A-2(17). Chapter 41A-2 contained the following definitions:

> (3) ADULT CABARET means a nightclub, bar, restaurant, or similar commercial establishment which regularly features:
>
> (a) persons who appear *in a state of nudity;* or
>
> (b) live performances which are characterized by the exposure of "specified anatomical areas" or by "specified sexual activities"; or
>
> (c) films, motion pictures, video cassettes, slides, or other photographic reproductions which are characterized by the depiction or description of "specified sexual activities" or "specified anatomical areas."
>
> ....
>
> (13) NUDITY OR STATE OF NUDITY means the appearance of a bare buttock, anus, male genitals, female genitals, or *female breast.*
>
> ....
>
> (18) SPECIFIED ANATOMICAL AREAS means human genitals in a state of sexual arousal.

(Emphasis added.) These definitions, as well as the location provision, were held constitutional. *See **Dumas v. City of Dallas**,* 648 F. Supp. 1061 (N.D. Tex. 1986), *aff'd sub nom. **FW/PBS, Inc. v. City of Dallas**,* 837 F.2d 1298 (5th Cir. 1988), *aff'd in part, rev'd in part and vacated in part on other grounds,* 493 U.S. 215 (1990).

*In order to avoid SOB status and, as a result, inter alia,*
*having to relocate*, some establishments (including most of
Plaintiffs') changed their dancers' attire to "simulate" nudity:
bikini bottoms and flesh-colored pasties over the areolae of the
female breast. Doing so enabled them to obtain "dance hall"
licenses under Dallas City Code Chapter 14. (As the district court
noted in this action, consistent with findings stated in the
Ordinance at issue, Chapter 14 "did not, and wasn't designed to,
regulate [SOBs]". ***Baby Dolls Topless Saloons, Inc. v. City of
Dallas***, 114 F. Supp. 2d 531, 535 (N.D. Tex. 2000).)

In the face of this attempt, through Chapter 14, to avoid SOB
status, the City enacted Ordinance 21184 in 1992, amending Chapter
14 to create a new classification of dance halls: Class D.
Establishments receiving the new Class D classification were
*subject to location provisions similar to those in Chapter 41A,*
*covering SOBs*. In short, the new Class D status was equivalent to
being a SOB.

That ordinance contained, *inter alia*, the following
definitions:

> CLASS D DANCE HALL means any place:
>
> (A) where dancing is permitted one day a
> week or more by a person in a state of *semi-*
> *nudity or simulated nudity*[.]
>
> ....
>
> SEMI-NUDITY means a state of dress in which
> clothing covers no more than the genitals,

4

> pubic region, buttocks, and *areolae of the female breast....*
>
> SIMULATED NUDITY means a state of dress in which a device or covering, exposed to view, is worn that simulates any part of the genitals, buttocks, pubic region, or *areolae of the female breast.*

Dallas, Tex., Ordinance 21184 (emphasis added). The location provisions and simulated nudity definition were upheld against First Amendment challenges. *See **MD II Entm't, Inc. v. City of Dallas***, No. 3:92-CV-1090-H, 1993 WL 227774 (N.D. Tex. 1993) (***MD II (1)***), *aff'd*, 28 F.3d 492 (5th Cir. 1994).

Therefore, *again to avoid SOB status and resulting relocation*, many establishments (including most of Plaintiffs') once more changed their dancers' attire: to non-flesh-colored, opaque pasties and bikini bottoms substantially covering the pubic region and buttocks. Doing so enabled them to apply for, and operate under, Class A dance hall licenses, instead of having Class D/SOB status and being required to relocate.

As a result, in 1993, the City enacted Ordinances 21837 and 21838, amending Chapters 14 and 41A respectively, "because certain businesses *featuring adult entertainment* [had] found a way to circumvent the location restrictions set forth in [those] Chapters". ***Baby Dolls***, 114 F. Supp. 2d at 536. The new ordinances included the following definitions:

> NUDITY or a STATE OF NUDITY means:

5

(A) the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast; or

(B) a state of dress that fails to opaquely cover a human buttock, anus, male genitals, female genitals, or *any part of the female breast below the top of the areola.*

....

SEMI-NUDITY means a state of dress in which clothing covers no more than the genitals, pubic region, buttocks, and *any part of the female breast below the top of the areolae....*

....

SIMULATED NUDITY means a state of dress in which any device or covering, exposed to view, is worn that simulates any part of the genitals, buttocks, pubic region, or *any part of the female breast below the top of the areolae.*

Dallas, Tex., Ordinances 21837, 21838 (emphasis added; 21837 (amending § 14) *and* 21838 (amending § 41A) were enacted the same day.) The effect of the ordinances was to require dancers at businesses such as Plaintiffs' to, among other things, wear bikini tops in order for the businesses to avoid SOB classification and concomitant relocation.

The amendments to the terms "nudity", "semi-nudity", and "simulated nudity" were held violative of the First Amendment. *See MD II Entm't, Inc. v. City of Dallas*, 935 F. Supp. 1394 (N.D. Tex. 1995) (*MD II (2)*), *aff'd*, 85 F.3d 624 (5th Cir. 1996) (per curiam; table). Among other things, the district court held: "no evidence indicate[d] that the drafters of the 1993 amendments *relied upon*

6

*any studies* indicating [the amendments'] necessity or effectiveness", *id.* at 1397; and "no evidence indicates that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects", *id.* at 1398. In this light, the district court concluded that the challenged amendments were content-based and impermissible restrictions on protected expression. *Id.* at 1399.

In a one paragraph opinion, our court affirmed. It agreed with the district court's finding "'no evidence indicat[ing] that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects'". No. 95-10322 (5th Cir. 30 Apr. 1996) (per curiam; unpublished).

In the light of **MD II (2)**, the City consulted, and considered, data and studies concerning the deleterious secondary effects of SOBs, including: 1983, 1986, 1991, and 1997 studies by the City of Houston (Houston studies); a summary of land use studies compiled by the National Law Center for Children and Families; and 1994 and 1997 studies conducted, at the City's request, by the Malin Group (Malin studies).

The Malin Group reviewed studies completed by Austin, Los Angeles, Indianapolis, Phoenix, and New York (which found SOBs to have a variety of deleterious secondary effects, including increased crime rates, lowered property values, and the deterioration of community character and quality of life). In

7

addition, the Malin Group studied the *secondary effects of SOBs in Dallas*.

The Dallas study compared a study area containing seven SOBs to two control areas, the first containing no SOBs and the second containing two SOBs located a half-mile apart but within 1000 feet of residential uses. After gathering data on a number of categories of crime, the study concluded that sex-related crime rates in the study area were more than three times higher than the city-wide average and five to ten times higher than in the control areas. In addition, the study found that, *inter alia*, properties in areas surrounding SOBs had lower values, were more difficult to lease, and remained on the market longer than in other areas.

The Malin studies did not consider whether the contested change in dancer attire (from pasties to bikini tops) would impact these deleterious secondary effects. Likewise, as Malin testified during a preliminary injunction hearing, the other studies his group had reviewed did not consider that question.

Beyond the mentioned studies, the City Plan Commission and City Council conducted four public hearings regarding SOBs and the proposed amendments. The City Zoning Ordinance Advisory Committee received public comment on the amendments. And, the City Council held at least six town hall meetings regarding SOBs and the proposed amendments.

In 1997, the ordinance at issue was enacted by the City: Ordinance 23137 (the Ordinance), which again amended Chapters 14 and 41A. The district court found:

> The enactment of [the] Ordinance ... was a response to the City Council's expressed concern to better protect the public health, safety, and welfare, and was intended to address the deleterious secondary effects of [SOBs], and to enhance land use protection for residential areas and other surrounding areas.

*Baby Dolls*, 114 F. Supp. 2d at 539.

The Ordinance eliminates the Chapter 14 Class D (SOB) dance hall classification and retains the definition of "sexually oriented business": "an adult arcade, adult bookstore or adult video store, adult cabaret, adult motel, adult motion picture theater, adult theater, escort agency, nude model studio, or sexual encounter center". But, it amends Chapter 41A-2 to read, in pertinent part:

> (3) ADULT BOOKSTORE or ADULT VIDEO STORE means a commercial establishment that *as one of its principal business purposes* offers for sale or rental for any form of consideration any one or more of the following:
>
> (A) books, magazines, periodicals or other printed matter, or photographs, films, motion pictures, video cassettes or video reproductions, slides, or other visual representations that depict or describe ... "*specified anatomical areas*"....
>
> (4) ADULT CABARET means a commercial establishment that *regularly features* the offering to customers of live entertainment that:

9

(A) is intended to provide sexual stimulation or sexual gratification to such customers; and

(B) is distinguished by or characterized by *an emphasis on* matter depicting, simulating, describing, or relating to "*specified anatomical areas*"....

....

(6) ADULT MOTION PICTURE THEATER means a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are *regularly shown* that are *characterized by* the depiction or description of ... "*specified anatomical areas.*"

....

(17) NUDITY or a STATE OF NUDITY means:

(A) the appearance of a human bare buttock, anus, male genitals, female genitals, or female breast; or

(B) a state of dress that fails to completely and opaquely cover a human buttock, anus, male genitals, female genitals, or *any part of the female breast or breasts that is situated below a point immediately above the top of the areola.*

....

(24) SPECIFIED ANATOMICAL AREAS means:

(A) any of the following, or any combination of the following, when less than completely and opaquely covered:

(i) any human genitals, pubic region, or pubic hair;

(ii) any buttock; or

10

> (iii)*any portion of the female breast or breasts that is situated below a point immediately above the top of the areola....*

(Emphasis added.)  The amended definitions of "specified anatomical areas" and "nudity or a state of nudity" contain substantially the same language as had Ordinances 21837 and 21838 (1993), held in **MD II (2)** violative of the Constitution.

These amended definitions operate to classify Plaintiffs as SOBs (*i.e.*, adult cabarets).  Accordingly, Plaintiffs must either comply with Chapter 41A's SOB location and licensing provisions or avoid SOB classification (and, therefore, remain at their current locations) by requiring their dancers to, *inter alia*, wear bikini tops.

In June 1997, Plaintiff Baby Dolls Topless Saloons, Inc., which had been *denied a SOB license* because of non-compliance with Chapter 41A's location provisions (the specific issue, discussed *infra*, concerned zoning to streets' center lines), brought this action as an as-applied challenge to its license denial.  The district court permitted intervention by 11 other establishments which challenged the Ordinance on a variety of First and Fourteenth Amendment grounds and sought declaratory and injunctive relief.  In March 1998, the court preliminarily enjoined the City from, *inter alia*, enforcing Chapter 41A against Plaintiffs through the amended definition of "specified anatomical areas".

11

Following a bench trial in September 1998, the district court entered judgment for the City in May 2000. In extremely detailed and comprehensive findings and conclusions, the court held: the City was not precluded from litigating the Ordinance's constitutionality, 114 F. Supp. 2d at 542; the Ordinance was a content-neutral time, place, or manner regulation and satisfied the test for such regulations, *id.* at 544-49; the Ordinance is not overbroad, *id.* at 543-44; a related "no-touch" provision of Chapter 41A-18.1 is constitutional, *id.* at 549; and zoning residential districts to the center line of streets (which resulted in the denial of Baby Dolls' SOB license) was constitutional, *id.* at 542-43.

## II.

Bench trial findings of fact are reviewed for clear error; conclusions of law, *de novo*. *E.g., **Joslyn Mfg. Co. v. Koppers Co., Inc.**,* 40 F.3d 750, 753 (5th Cir. 1994). Although numerous conclusions of law are challenged in this appeal, no findings of fact are. Our standard of review is further discussed with respect to each issue.

## A.

Plaintiffs contend that, in the light of **MD II (2)**, the City is collaterally estopped from litigating the Ordinance's constitutionality. Collateral estoppel *vel non* is a question of law reviewed *de novo*. *E.g., **United States v. Brackett**,* 113 F.3d

12

1396, 1398 (5th Cir.), *cert. denied*, 522 U.S. 934 (1997).  In considering collateral estoppel, we decide whether

> (1) *the issue under consideration is identical to that litigated in the prior action*; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) *there is no special circumstance that would make it unfair to apply the doctrine*.

**Winters v. Diamond Shamrock Chem. Co.**, 149 F.3d 387, 391 (5th Cir. 1998) (emphasis added; quoting **Copeland v. Merrill Lynch & Co.**, 47 F.3d 1415, 1422 (5th Cir. 1995)), *cert. denied*, 526 U.S. 1034 (1999).  Here, the first and fourth prongs are of primary concern.

As noted, **MD II (2)** concerned the constitutionality of 1993 amendments to the definitions of nudity, semi-nudity, and simulated nudity to include "any part of the female breast below the top of the areola".  The district court then held:  as quoted earlier, "[n]o evidence indicates that the drafters of the 1993 amendments relied upon any studies indicating their necessity or effectiveness",  935 F. Supp. at 1397; "[n]o evidence indicates that the city conducted public meetings to consider any information regarding semi-nude dancing, deleterious secondary effects, or the relationship of the two", *id.* at 1398; and, as also quoted earlier, "no evidence indicates that a requirement that dancers wear bikini tops instead of pasties will reduce deleterious secondary effects", *id.*  Accordingly, it held:  the City had "*failed to show that a substantial governmental interest* was the predominant factor

13

motivating it in enacting the amendments", *id.* at 1397 (emphasis added); and "the 1993 amendments [were] content-based restrictions on protected expression", *id.* at 1399. Accordingly, it awarded plaintiffs summary judgment. As stated, our court affirmed. 85 F.3d 624 (5th Cir. 1996) (per curiam; table).

For this action, in holding the City not estopped from litigating the constitutionality of the Ordinance (enacted in 1997), the district court concluded:

> The issue in this case is not "identical" [to that] in *MD II (2)* because this case presents the constitutionality of a[] different ordinance, which uses the same language as the unconstitutional ordinance in *MD II (2)*, that was enacted by the City *after considerable study and fact-finding, which were lacking in MD II (2)*.

*Baby Dolls*, 114 F. Supp. 2d at 542. It also held that, per the fourth collateral estoppel prong, "the enactment of [the] Ordinance ... after the City's fact-finding is a 'special circumstance' that makes the application of issue preclusion unfair". *Id.*

Plaintiffs maintain the merits-issue here is identical to that in *MD II (2)*. They characterize it as "whether the regulation of dancer attire through requiring the bottom half of a dancer's breasts to be covered is an impermissible *content-based* restriction". (Emphasis added.) Content-neutrality *vel non* is an issue in both cases, but only in a general sense. The content-neutrality *vel non* of a given ordinance is, as discussed below, a

14

function of a city's predominant concern in enacting *that* ordinance, and the ordinance at issue here is not the same as was at issue in **MD II (2)**.

"[C]hanges in facts essential to a judgment will render collateral estoppel inapplicable in a subsequent action raising the same issues". **Montana v. United States**, 440 U.S. 147, 159 (1979). As discussed, between **MD II (2)** and enactment of the Ordinance, the City conducted and reviewed studies, held public hearings, and took public comment on the proposed amendments and the SOBs' secondary effects. Plaintiffs may not agree that those activities are reasonably believed to be related to deleterious secondary effects of their establishments. But, that is a separate issue on the merits, to be answered in the light of the evidence that the City gathered and considered in enacting the Ordinance.

B.

"Whether ... free speech rights have been infringed is a mixed question of law and fact [and t]he appropriate standard of review is de novo". **Int'l Soc'y for Krishna Consciousness of New Orleans, Inc. v. Baton Rouge**, 876 F.2d 494, 496 (5th Cir. 1989) (citing **Dunagin v. City of Oxford**, 718 F.2d 738, 748 n.8 (5th Cir. 1983), *cert. denied*, 467 U.S. 1259 (1984)).

Plaintiffs maintain that, in reviewing their First Amendment challenge to the amended definition of "specified anatomical areas" (SAAs), the district court erred by applying the test for content-

15

neutral time, place, or manner regulations set out in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47 (1986). They assert: the Ordinance is not content-neutral because it "targets the essential expressive nature of the featured entertainment of the Cabarets' business"; and its "justification ... was not shown to be related to the 'secondary effects' focus of the Ordinance".

Under *Renton*, "zoning ordinances designed to combat the undesirable *secondary effects* of [SOBs] are to be reviewed under the standards applicable to 'content-neutral' time, place, and manner regulations". 475 U.S. at 49 (emphasis added). And, "findings of the [City] as to the secondary effects of sexually oriented businesses [can] satisfy us ... that [its] predominant concern was with secondary effects and not the content of expression itself". *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1273 (5th Cir. 1988), *cert. denied*, 489 U.S. 1052 (1989). *SDJ, Inc.*, involved a similar zoning scheme that imposed location restrictions on establishments "characterized by an emphasis on matter depicting, describing or relating to ... *specified anatomical areas*", defined as "[l]ess than completely and opaquely covered ... [f]emale breast[s] ... below a point immediately above the top of the areola". *Id.* at 1278 n.36 (emphasis added).

As noted, for the ordinance at issue here, the City commissioned studies and engaged in a series of public hearings, comment-taking, and town hall meetings regarding SOBs' deleterious

16

effects. The City's concerns are adequately expressed in the Ordinance's preambulary language:

> WHEREAS, the provisions of *Chapter 14* governing Class A dance halls are *intended* to regulate businesses where *clothed* patrons dance and *not* businesses where *unclothed or scantily* clad dancers perform to provide *sexual stimulation and gratification to patrons;* and
>
> WHEREAS, the city council finds that such [latter] businesses operating as Class A dance halls under Chapter 14[, thereby avoiding Class D status and the concomitant location provision,] *are, in effect, [SOBs] and have the same harmful secondary effects on the surrounding community as the [SOBs] currently regulated under Chapter 41A;* ...
>
> ....
>
> WHEREAS, the city council finds that a concentration of [SOBs] continue[s] to contribute to a decline in the value of surrounding properties, to an increase in criminal activities in the surrounding community, and to urban blight and a downgrade in the quality of life in the surrounding community; ...
>
> ....
>
> WHEREAS, the city council believes that, to better protect the public health, safety, and welfare, it is *necessary to adopt additional amendments* to Chapter 41A that would enhance land use protection to residential areas and other surrounding areas; ... restrict the location of [SOBs] near child-care facilities to protect the children that attend those facilities; and establish rules of conduct for certain [SOB] employees and customers....

Dallas, Tex., Ordinance No. 23137 at 2-5 (emphasis added).

17

Plaintiffs maintain, however, that the evidence the City relied upon is irrelevant to the Ordinance. They reiterate one of the several earlier-quoted concerns of **MD II (2)**: "No evidence indicates that a requirement that all dancers wear bikini tops instead of pasties will reduce deleterious secondary effects". 935 F. Supp. 1398-99. In this regard, Plaintiffs emphasize two of the district court's findings in the action at hand: "the Malin studies did not study whether a change in a dancer's attire from pasties to bikini tops would affect secondary effects"; and "Malin ... testified that his studies indicated that the change in attire would not have an impact on secondary effects". **Baby Dolls**, 114 F. Supp. 2d at 540. According to Plaintiffs, there must be *specific* evidence linking bikini tops to reducing secondary effects.

**Renton**, however, does not require a "city to demonstrate[,] ... with empirical data, that its ordinance will successfully lower crime", at least "not without actual and convincing evidence from plaintiffs to the contrary". **City of Los Angeles v. Alameda Books, Inc.**, 122 S. Ct. 1728, 2002 WL 970712, at *9 (U.S. 13 May 2002) (plurality). "Such a requirement would go too far in undermining [the] settled position that municipalities must be given a reasonable opportunity to experiment with solutions to address the secondary effects of protected speech". **Id.** (internal citations and quotation marks omitted).

> ***Renton*** teaches us that the government must produce *some* evidence of adverse secondary effects produced by ... adult entertainment in order to justify a challenged enactment using the secondary effects doctrine.... ***Renton*** also instructs us that a government must present sufficient evidence to demonstrate "a link between the regulation and the asserted governmental interest," under a "*reasonable belief*" standard....

***J&B Entm't, Inc. v. City of Jackson***, 152 F.3d 362, 371-72 (5th Cir. 1998) (emphasis added; quoting ***Renton***, 475 U.S. at 51-52). Accordingly, we must determine whether, under this *reasonable belief* standard, the City's evidence demonstrates a *link* between its interest in combating secondary effects and the Ordinance.

That standard is satisfied. The Ordinance was enacted, in part, because the City had found that, through Chapter 14, entities that were, in effect, SOBs were avoiding that classification; and that concentrated SOBs "continue to contribute to ... an increase in criminal activities in the surrounding community". Dallas, Tex., Ordinance 23137 (preamble). Among other relied-upon data, the 1997 Malin Study supports that increased-criminal-activities finding. From January 1993 through March 1997, there were 396 arrests for sex crimes ("Rape, Prostitution/Commercial Vice[,] and other Sex Offenses") in the study area (which included a concentration of seven SOBs), as compared to 133 such arrests in one control area (containing two SOBs located approximately a half-

19

mile apart) and 77 such arrests in another control area (containing no SOBs).

In short, sex crime arrests were three to five times more frequent in the study area. While the Malin Study is careful not to attribute this disparity *entirely* to SOBs, it did find a correlation between SOBs — specifically, their "hours of operation and the type of people which SOBs attract" — and higher crime rates.

These findings are "*reasonably believed* to be relevant to the problem that the [C]ity addresses". *Renton*, 475 U.S. at 51-52 (emphasis added). The City relied upon specific evidence showing, *inter alia*, higher crime rates in the vicinity of SOBs. The City's attempts to deal with that reality had been continuously frustrated in the past, most recently by "exploitation of a 'loophole' in the City Code that permitted such businesses to avoid the location restrictions by obtaining dance hall licenses pursuant to Chapter 14, *which was not originally designed to regulate such businesses*". *Baby Dolls*, 114 F. Supp. 2d at 547 (emphasis added).

"[T]he Ordinance is a comprehensive amendment to Chapters 14 and 41A to carry out the City's *original intent in combating secondary effects associated with [SOBs]*". *Id.* (emphasis added). "[T]he evidence does not connect the wearing of bikini tops to the reduction of secondary effects", *id.;* but, in the light of the data considered by the City and other steps taken by it prior to

20

enacting the Ordinance, it was not necessary to make that connection. Instead, it was reasonable for the City to conclude that establishments featuring performers in attire more revealing than bikini tops pose the same types of problems associated with other SOBs.

C.

Plaintiffs next contend that the amended definition of SAAs is overbroad because it will operate to classify a number of "mainstream" businesses (movie theaters, video stores, *and live theaters*) as SOBs (adult motion picture theaters, adult video stores, *and adult theaters*). The City, however, recently amended Chapter 41A-2 to *remove adult theaters* (theaters, auditoriums, concert halls, etc., featuring live entertainment) from the definition of SOBs. Dallas, Tex., Ordinance 24699 (22 Aug. 2001). As a result, we limit our overbreadth inquiry to whether the SAAs amended definition operates to classify "mainstream" movie theaters and video stores as "adult" motion picture theaters and video stores.

Facial overbreadth claims, being constitutional challenges, are reviewed *de novo*. *E.g.*, **United States v. Stansell**, 847 F.2d 609, 612 (9th Cir. 1988). "[F]acial overbreadth adjudication is an exception to ... traditional rules of practice". **Broadrick v. Oklahoma**, 413 U.S. 601, 615 (1973). It should be employed "sparingly, and only as a last resort". **Id.** at 613. "[W]here

21

conduct and not merely speech is involved, ... the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep". *Id.* at 615. The Ordinance is not facially overbroad.

With respect to movie theaters, Chapter 41A defines an *adult motion picture theater* as

> a commercial establishment where, for any form of consideration, films, motion pictures, video cassettes, slides, or similar photographic reproductions are *regularly* shown that are *characterized* by the depiction or description of ... "[SAAs]."

DALLAS, TEX., CODE § 41A-2(6) (emphasis added). "Characterize" means "to describe *the essential* character or quality of". WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 376 (1986) (emphasis added) (hereinafter WEBSTER'S). The chance that "mainstream" movie theaters will show films with depictions of SAAs *as their essential quality*, and will do so *regularly*, is highly improbable, as is the chance that they will be classified as "adult" motion picture theaters (and thus SOBs).

With respect to video stores, an *adult video store* is defined as

> a commercial establishment that *as one of its principal business purposes* offers for sale or rental for any form of consideration any one or more of the following ... films, motion pictures, video cassettes or video reproductions, slides, or other visual

22

> representations that depict or describe ...
> "[SAAs]".

DALLAS, TEX., CODE § 41A-2(3) (emphasis added). "Principal" is defined as "most important, consequential, or influential: relegating comparable matters [or] items ... to secondary rank". WEBSTER'S 1802. The likelihood of a "mainstream" video store's falling within the definition of an "adult" video store, and thus of a SOB, is, as with movie theaters, highly improbable.

At any rate, if there is any real overbreadth in Chapter 41A, it is certainly not "substantial [when] judged in relation to [its] plainly legitimate sweep". *Broadrick*, 413 U.S. at 615. This understanding of the plain language of Chapter 41A-2, as amended, is confirmed by the limiting construction by the City Attorney post-enactment of the Ordinance and filing of this action. That limiting construction provides that businesses "which feature adult magazines, NC-17 or R-rated video tapes, and NC-17 or R-rated motion pictures", shall not be classified as SOBs by virtue of their featuring such products. Memorandum from City Attorney to Chief of Police 2-3 (5 June 1998). The City's Police Chief testified that his department relies on the limiting construction, and the City has an established history of not classifying mainstream businesses as SOBs.

"Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court

23

must ... consider any limiting construction that a state court or enforcement agency has proffered.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) (quoting *Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494, n.5 (1982)).   The district court characterized the limiting construction as "preclud[ing] the classification of mainstream businesses as [SOBs] even if such businesses feature an article or activity that display[s] a [SAA]".  *Baby Dolls*, 114 F. Supp. 2d at 543-44.

Plaintiffs maintain that *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750 (1988), requires that "the limits the city claims are in its law *be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice*".  *Id.* at 770 (emphasis added).  That case concerned a city ordinance vesting the mayor with unfettered discretion to grant or deny applications from publishers for permits to place newsracks on public property.  The Court noted that, in the area of free expression, a licensing scheme placing unbridled discretion with a public official amounts to a prior restraint, *id.* at 757, and held:  "*[T]he doctrine forbidding unbridled discretion* ... requires that the limits that the city *claims are implicit* in its law *be made explicit*", *id.* at 770 (emphasis added).

The Ordinance does not vest unbridled discretion in the City or in any City official. It is not a prior restraint. As the Court noted in **Plain Dealer Publishing**, it would "presume any narrowing construction or practice to which the law is 'fairly susceptible'". *Id.* at 770 n.11; *see also* **Broadrick**, 413 U.S. at 613 ("Facial overbreadth has not been invoked when a limiting construction has been *or could be* placed on the challenged statute." (Emphasis added.)).

D.

Plaintiffs next contend the district court erred in holding that, as applied, the following "no touch" provision is not an unconstitutional, content-based restriction on speech. The provision provides:

> (a) An *employee* of an adult cabaret, while exposing any [SAAs], commits an offense if the employee touches a customer or the clothing of a customer.
>
> (b) A *customer* at an adult cabaret commits an offense if he touches an employee who is exposing any [SAAs] or touches the clothing of the employee.

DALLAS, TEX., CODE § 41A-18.1 (emphasis added). Again, free speech claims present a mixed question of law and fact, reviewed *de novo*.

*E.g.*, *Int'l Soc'y for Krishna Consciousness*, 876 F.2d at 496.

As the district court noted, *see Baby Dolls*, 114 F. Supp. 2d at 549, our court held in *Hang On, Inc. v. City of Arlington*, 65 F.3d 1248, 1253 (5th Cir. 1995) (first emphasis added):

> [I]ntentional contact between a nude dancer and a ... patron is conduct beyond the expressive scope of the dancing itself. *The conduct at that point has overwhelmed any expressive strains it may contain.* That the physical contact occurs while in the course of protected activity does not bring it within the scope of the First Amendment....
>
> Similarly, *patrons* have no First Amendment right to touch a nude dancer.

*Hang On* concerned a facial challenge to a provision almost identical to the one at issue here. *See id*. at 1251.

Plaintiffs point to the fact that the SOB in *Hang On* did not offer evidence of the expressive nature of touch in the course of a "table" or "lap dance" ("which involves contact between the dancer, while exposing [SAAs], and the customer", *Baby Dolls*, 114 F. Supp. 2d at 541). Plaintiffs, on the other hand, did provide the following testimony by one of their witnesses (a cultural anthropologist) that innocuous touch between a dancer and patron communicates a distinct message: "concern, affection, caring and ... eliminat[ion of] the sense of distance and coldness[;] the message that the dancers really want to get across ... is the man is king for the moment, as it were". They contend: "Touch is an essential element of 'private dance' expression".

26

*Hang On* did *not* hold that such innocuous touch may contain unique, *expressive* elements. Instead, as emphasized in the above-quoted passage, it held: "The conduct at that point [intentional contact] has overwhelmed *any expressive strains* it *may* contain". *Id.* at 1253 (emphasis added). Restated, that holding did not turn on evidence *vel non* presented by an SOB. It controls here.

E.

Finally, Plaintiff Baby Dolls appeals the denial of its SOB permit (and, previously, one for Class D) because its proposed location was within 1000 feet of a freeway, which is zoned a residential district. The district court noted: a zoning regulation is ordinarily constitutional so long as there is "any possible rational basis" for it, *SDJ, Inc.*, 837 F.2d at 1273 (quoting *Shelton v. City of College Station*, 780 F.2d 475, 479 (5th Cir. 1986) (en banc)); the zoning of the freeway as a residential district was consistent with the City's Development Code and historical zoning practices; and, most importantly, the zoning classification "*predates* the existence of [SOBs] and was *not motivated* to restrict any form of expression". *Baby Dolls*, 114 F. Supp. 2d at 543 (emphasis added). Accordingly, and citing *Employment Division, Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 882 (1990), the district court held: "[T]he classification is a content-neutral, generally applicable law that does not violate the First Amendment even if it incidentally

27

burdens [Baby Dolls'] protected expression". **Baby Dolls**, 114 F. Supp. 2d at 543.

Baby Dolls maintains the district court "misconstrued the First Amendment claim as being a challenge to the City's policy of zoning to the middle of the street". "What is properly to be evaluated", according to Baby Dolls, "is the application of [the] one thousand (1000) foot distance restriction from residentially zoned property when that property is a freeway and there is no likelihood of residential use". In that light, Baby Dolls urges us to apply the four-part test for incidental limitations on expressive conduct set out in **United States v. O'Brien**, 391 U.S. 367 (1968).

Even if we accept Baby Dolls' framing of the appropriate inquiry and review its claim *de novo*, its contention fails. "Regulations that burden speech incidentally or control the time, place, and manner of expression must be evaluated in terms of their *general* effect." **United States v. Albertini**, 472 U.S. 675, 688-89 (1985) (emphasis added; citation omitted). "The First Amendment does not bar application of a *neutral regulation* that incidentally burdens speech merely because a party contends that allowing an exception *in the particular case* will not threaten important government interests." *Id.* at 688 (emphasis added; citing **Clark v. Cmty. for Creative Non-Violence**, 468 U.S. 288, 296-297 (1984)).

III.

For the foregoing reasons, the judgment is

**AFFIRMED.**